UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 06-196(1) (JRT/SRN) |
| Plaintiff, | |
| v. | **AMENDED REPORT AND RECOMMENDATION** |
| Michael Roman Afremov, | |
| Defendant, | |
| and | |
| Computer Forensic Services and Mark Lanterman, | |
| Movants. | |

Joseph G. Petrosinelli, Williams & Connolly LLP, 725 12th Street NW, Washington, D.C. 20005; and Frank R. Berman, 701 Fourth Avenue South, Suite 500, Minneapolis, Minnesota 55415; for Defendant Michael Roman Afremov

John F. Bonner III, Bonner & Borhart LLP, 220 South Sixth Street, Suite 1950, Minneapolis, Minnesota 55402, for Movants Computer Forensic Services and Mark Lanterman

SUSAN RICHARD NELSON, United States Magistrate Judge

This matter is before the Court on the Motion to Quash Subpoenas by Computer Forensic Services and Mark Lanterman (Doc. No. 277). The motion was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) by an order of the District Court dated March 26, 2008.

I.  **FACTUAL AND PROCEDURAL BACKGROUND**

On April 17, 2007, Defendant Michael Roman Afremov served subpoenas duces tecum on Computer Forensic Services ("CFS") and Mark Lanterman, requesting all documents, including electronic files and data, obtained from AGA Medical Corporation ("AGA") or its

officers, directors, owners, employees, attorneys, or receivers; all documents, including electronic files and data, relating to Franck Gougeon, Kurt Amplatz, Michael Afremov, AGA, Frederick Fischer, or Foremost Machining Company; and all electronic mail created or received by Franck Gougeon, Kurt Amplatz, Michael Afremov, or any officer, director, or employee of AGA.  The return date on the subpoenas was September 10, 2007, Afremov's original trial date.[1]

CFS is in the business of providing electronic discovery, forensic analysis, and litigation support services.  Lanterman is the Chief Technical Officer of CFS, and as such, was primarily responsible for responding to the subpoenas.  Lanterman had previously served as an expert consultant to a court-appointed receiver for AGA in a related civil case, <u>Afremov v. Amplatz</u> ("AGA civil case").  In his capacity as consultant, Lanterman reconstructed, searched, analyzed, and produced electronic data from hard drives and other electronic storage devices obtained from AGA.  The data was kept in an encrypted format to ensure confidentiality and limit access to authorized individuals.  At the conclusion of the AGA civil case, Hennepin County District Court Judge Patricia Karasov entered a Discharge Order,[2] which the parties agreed provided in

---

[1] Afremov's trial was later continued to March 31, 2008.

[2] The Discharge Order is under seal, and neither party made it a part of the record in this proceeding.  The parties agreed that the Discharge Order permitted access to the AGA materials, now in possession of CFS, so long as CFS was paid "reasonable costs and fees."  The only dispute before this Court is the amount of those costs and fees.

On July 25, 2008, this Court received a letter from counsel for AGA, who is not a party to this proceeding and did not submit any briefing in connection with this proceeding.  The letter challenges the accuracy of this Court's original Report and Recommendation with regard to the content of the Discharge Order.  AGA takes the position that the Discharge Order is silent as to CFS and addresses only litigation files in the possession of Bassford Remele, counsel to AGA.  Whether the Discharge Order specifically addresses the data in the possession of CFS is of no import to this Court.  The parties to this proceeding agreed that the materials in CFS's possession could be accessed, by way of subpoena, and do not dispute that reasonable costs and fees would be paid to CFS for access to that data.  Accordingly, this Court takes no position on the content

part that AGA shareholders, including Afremov, could access the AGA materials (now possessed by CFS) but would have to pay "reasonable costs and fees" for those materials. The receiver later advised Lanterman that he should retain the AGA data that had originally been provided to CFS, but neither the receiver nor the Discharge Order required CFS to retain the final data product that had ultimately been delivered to the receiver, such as the results of particular searches, recovered emails, and data pertaining to an AGA employee embezzlement investigation. In December 2006, that material was deleted from CFS's servers in accordance with its data retention policy.

On April 18, 2007, one of Afremov's lawyers in this case, Joseph Petrosinelli, wrote to Lanterman advising him of the forthcoming subpoenas and asking him to preserve all AGA materials in CFS's possession and "conduct whatever compilation and review of the documents that you believe is necessary in advance of production to us." (Lanterman Aff. Ex. A, Mar. 3, 2008.) Petrosinelli also referred to the Discharge Order and assured, "Pursuant to that Order, Mr. Afremov will pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas. Please send all bills for such costs to my attention . . . ." (Id.)

Shortly after receiving Petrosinelli's letter, Lanterman met with Afremov's local counsel, Frank Berman, at attorney Scott Harris's office. Lanterman had retained Harris on Berman's

---

of the Discharge Order as it relates to litigation files in the possession of AGA's counsel, nor does the Court take a position on AGA's apparent challenge to the authority of CFS to possess such data. Finally, AGA challenges the authority, if any, of counsel for the former Receiver of AGA to opine on whether CFS should retain its data. Again, this Court takes no position on Mr. O'Rourke's authority to opine on that issue with Mr. Lanterman. This Court merely recounted the testimony before it in its original Report and Recommendation. Whether Mr. O'Rourke had authority to advise CFS does not in any way impact this Court's final decision in this matter.

recommendation to review the eventual document production[3] for privilege issues. Lanterman had met with Berman once before, prior to the subpoenas being issued, and had told him at that time that the amount of AGA data was enormous. At the second meeting, Berman asked Lanterman to produce responsive documents as soon as practicable, even though the return date on the subpoenas was five months away. Berman also told Lanterman to leave no stone unturned. Lanterman suggested several search terms to narrow the production, and Berman also gave some terms to Lanterman. Berman did not ask about the specific details of the production process; he failed to ask Lanterman any questions about the process of recovering the data, searching the data, and producing the data. On his part, Lanterman did not explain what the data recovery and restoration processes would entail. Neither Berman nor Petrosinelli ever asked Lanterman how much the data recovery and production would cost, and Lanterman did not provide an estimate. At the hearing, however, Berman conceded that he and Petrosinelli "were very well aware of the extensive work that Mr. Lanterman had done and billed for on the AGA matter because we reviewed the file." (Hr'g Tr. at 137, June 9, 2008.)

The AGA electronic data consisted of millions of pages located on hundreds of hard drives and other electronic storage devices. The amount of data was, as Lanterman described, "immense." (Lanterman Aff. ¶ 7, Mar. 3, 2008.) For the first production of documents, CFS employees worked twenty-four hours a day, in three shifts. Because the AGA data was stored in an encrypted format, it had to be loaded on to a production server, decrypted, and verified, which

---

[3] Lanterman uses the term "work product" to refer to the final data product delivered to CFS's clients. Given the meaning of this phrase in the legal field and the possibility of confusion, the Court has used other language to refer to the final data product resulting from CFS and Lanterman's work.

is a lengthy process. The restoration involved eighty-four hard drives, thirteen data DVDs, and twenty-one data CDs. CFS employees also extracted emails from exchange servers, which alone took almost 400 hours of analyst time. Analyzing and processing the email compilation took nearly an additional 300 hours. All told, CFS employees worked 1500 hours in three weeks to produce four million pages of data. Given the extent of work and time demands of the Afremov job, CFS delayed and declined other work.

As agreed, Lanterman provided the responsive documents to Harris to review for attorney-client and work product privileges. Those materials were delivered to Harris on May 3, May 18, and June 5, 2007. Harris then reviewed the data and produced the non-privileged documents to Afremov's counsel.

CFS issued an invoice for the first production of documents on June 15, 2007, which covered all work performed before May 30, 2007, and some work performed between May 30 and June 5, 2007. The amount of the invoice was $674,861.08. Decryption and verification of data and the recovery and processing of emails accounted for most of the cost. Petrosinelli refused to pay the invoice, other than Harris's attorney's fees of $46,123.75. Petrosinelli's reason for nonpayment at that time, according to Lanterman, was that he did not want to appear as having bought a witness. The reason later changed to concern over the amount of the bill.

Although additional searches had yet to be performed, CFS did not produce any further documents after Petrosinelli refused to pay the invoice. When Berman learned the amount of the invoice in mid-July 2007, he was surprised. Berman told Harris to instruct Lanterman to stop working on the project immediately.

Attempts to resolve the payment dispute failed. Harris wrote to Petrosinelli and Berman

on July 11, 2007, verifying that Afremov had a right to access the AGA documents as long as he paid CFS its reasonable costs and fees, as promised. Petrosinelli wrote on October 1, 2007, that he considered Lanterman to be a mere fact witness subpoenaed in a criminal case who was entitled only to a statutory witness fee and incidental costs. Harris replied and reminded Petrosinelli that he had promised to pay CFS pursuant to the Discharge Order and that the amount of the invoice should not have been surprising. In early 2008, Afremov's counsel orally advised Lanterman's counsel in this litigation, John Bonner, that Afremov no longer wanted CFS to complete the work in responding to the subpoenas.

On March 3, 2008, CFS and Lanterman moved to quash the subpoenas on the grounds of overbreadth, oppressiveness, and unreasonableness, and because Afremov had not paid CFS's invoice for the documents produced thus far. CFS and Lanterman argued that the costs of further production would cause CFS hardship, considering that Afremov and his counsel were refusing to pay for the first document production. CFS and Lanterman also asked the court to order Afremov and his counsel to pay the invoice. CFS and Lanterman noted that in the AGA civil case, CFS had been paid its normal and customary rates for similar computer forensic work, which exceeded $1,200,000, and of which Afremov's counsel was well aware. In addition, CFS had been previously retained to perform computer forensic work in a case in which Petrosinelli's firm acted as co-counsel, and had incurred $830,000 in fees for its expert services.[4] Lanterman

---

[4] In Lanterman's affidavit of March 3, 2008, he attested that "Williams & Connolly retained CFS to perform work" in another case, and that "[i]ts client paid our invoice of approximately $830,000 for similar services." (Lanterman Aff. ¶ 12, Mar. 3, 2008.) Following the issuance of the Report and Recommendation, Petrosinelli wrote the Court on August 4, 2008, seeking to clarify, without documentation, that Leonard Street & Deinard had retained CFS in that matter. Which firm retained CFS is of no consequence, however, as Petrosinelli did not disclaim knowledge of the amount of the fees in that case.

asserted he never would have agreed to perform such an enormous amount of expert forensic work without Petrosinelli's promise to pay CFS's standard rates.

On March 19, 2008, Afremov pled guilty, and the District Court canceled the hearing on the motion to quash.  On March 26, 2008, Bonner wrote to the District Court and asked to be heard on the motion insofar as it pertained to payment for responding to the subpoenas.  The District Court referred the motion to this Court and instructed the parties to schedule a hearing.

On May 5, 2008, this Court held a hearing on the motion to quash but determined that additional information was needed from Lanterman to establish a complete record.  Two days later, on May 7, 2008, CFS issued a second invoice in the amount of $178,850 for some work performed before June 15, 2007, the date of the first invoice, and other work completed after that date but before CFS was instructed to stop working on the Afremov job.  On May 20, 2008, Lanterman provided a supplemental affidavit for the Court's in camera review, as the Court had requested.  Following that submission, Afremov and Lanterman both filed additional documents without obtaining permission from the Court.  At that point, the record contained numerous material inconsistencies, and the Court determined that an evidentiary hearing would be necessary.  That hearing occurred on June 9, 2008.  Lanterman and Berman testified at the hearing, and the Court received several exhibits into evidence.  At the close of the evidence, the parties requested permission to file post-hearing memoranda, the last of which was filed on June 30, 2008.  At that time, the Court took the matter under advisement.

## II.     DISCUSSION

### A.     Afremov's Counsel Hired Lanterman and CFS to Perform Expert Forensic Services

Afremov argues that Lanterman and CFS were simply fact witnesses who received subpoenas. In taking this position, however, Afremov does not account for Petrosinelli's letter, Berman's meeting with Lanterman, or the type of work requested of Lanterman. In Petrosinelli's letter of April 18, 2007, which Lanterman received even before the subpoenas, Petrosinelli instructed Lanterman essentially to use his discretion in compiling and reviewing documents, presumably based in large part on Lanterman's role as an expert in the AGA civil case. Petrosinelli promised that Afremov would pay for Lanterman's costs incurred "in connection with responding to this request and the forthcoming subpoenas." (Lanterman Aff. Ex. A., Mar. 3, 2008) (emphasis added). The use of the conjunctive "and" between "this request" and the "forthcoming subpoenas" indicates that "this request" was for something in addition to the straightforward request for data contained in the subpoenas. In the context of Lanterman's past work as an expert in the AGA civil case, the clear meaning of the letter was to request Lanterman to perform computer forensic services. Thus, Petrosinelli's letter both notifies Lanterman of the forthcoming subpoenas and asks him to perform additional expert forensic work.

Berman did not request that Lanterman, as a fact witness, simply turn over unsearchable data in his possession. To the contrary, Berman treated Lanterman as an expert. Berman gave specific search terms to Lanterman to utilize in searching for relevant documents and approved Lanterman's suggested search terms. The resulting searches were also forensic expert services,

8

not work that a fact witness would perform in exchange for a witness fee and incidental expenses. In addition, Berman stressed that time was of the essence and told Lanterman to leave no stone unturned. These instructions are not typically made to a mere fact witness responding to a subpoena. Indeed, the original subpoenas had instructed CFS and Lanterman to provide the requested data at the courthouse on the first day of trial.

Afremov has pointed out that there was no typical retainer agreement, but the lack of such an agreement is not dispositive of the nature of the retention, see Ngo v. Standard Tools & Equip. Co., Inc., 197 F.R.D. 263, 266 (D. Md. 2000) ("While a writing is not required, it goes a long way in eliminating the sort of problems found here."); Gundlach v. Nat'l Ass'n for Advancement of Colored People, Inc., No. 303CV1003J32MCR, 2005 WL 2012738, at **1, 3 (M.D. Fla. Aug. 16, 2005) (finding that an expert was retained by oral agreement). Furthermore, although Ngo concerned the capacity of an expert in a civil case, its categorization of the purposes for which experts may be retained is instructive. Ngo recognized that there are generally four types of experts: "(1) experts a party expects to use at trial; (2) experts retained or specially employed in anticipation of litigation, but not expected to be used at trial; (3) experts informally consulted in preparation for trial but not retained; and, (4) experts whose information was not acquired in preparation for trial." Ngo, 197 F.R.D. at 265 (citing 8 Charles Alan Wright et al., Federal Practice & Procedure § 2029 (citing Fed. R. Civ. P. 26(b)(4)). In the present case, Afremov did not expect to use Lanterman at trial, but he specially employed Lanterman in anticipation of his trial or, at minimum, informally consulted him in preparation for trial even though he did not formally retain him. Consequently, the lack of a separate formal retainer agreement does not necessarily mean that Afremov did not hire Lanterman and CFS to provide

expert forensic services.

Finally, the type of computer forensic services that Lanterman provided to Afremov have been found to be expert in nature. In <u>United States v. Ganier</u>, the court determined that a witness's testimony regarding forensic searches he had performed on computers required him "to apply knowledge and familiarity with computers and the particular forensic software well beyond that of the average layperson. This constitutes 'scientific, technical, or other specialized knowledge.'" 468 F.3d 920, 925-26 (6th Cir. 2006). Here, Lanterman and CFS employees decrypted and verified data, ran forensic searches, and extracted emails from exchange servers. This work required the application of skills and knowledge well beyond that of an average layperson.

### B. Afremov Should Pay the Full Amount of the First Invoice

Afremov suggests that he should be required to pay only CFS's "actual, out-of-pocket costs," despite Petrosinelli's assurance that Afremov would "pay <u>any</u> costs" incurred "in connection with responding to this request and the forthcoming subpoenas" and Petrosinelli's reference to the Discharge Order, which the parties agree requires payment of CFS's reasonable costs and fees. The Court views Petrosinelli's use of the words "any costs," combined with the reference to the Discharge Order, to mean that Afremov would pay CFS its customary rates for responding both to the subpoena and to Petrosinelli's additional request, as long as the charges were reasonable. On the other hand, nothing in the record supports Afremov's argument that he should pay only CFS's out-of-pocket costs.

To the extent the terms of payment could be considered ambiguous, any uncertainty should be resolved against Afremov. Lanterman testified that he never would have performed

the work requested by Afremov's counsel if he thought he was going to be paid only a witness fee and incidental costs and expenses.  The Afremov job took 1500 hours to complete, and CFS turned down and delayed other work in order to complete the job on Afremov's terms.  CFS should not be financially penalized for expeditiously responding to Afremov's requests.  Furthermore, Afremov's counsel knew of the work that Lanterman had done in the AGA civil case and the cost of that work, which weighs against his position that he expected to pay only out-of-pocket costs for similar work.  One final consideration is the basic principle of contract law that an ambiguity should be construed against the drafter, <u>Hilligoss v. Cargill, Inc.</u>, 649 N.W.2d 142, 148 (Minn. 2002), who, in this instance, was Petrosinelli.

Afremov next argues that Lanterman should have told him how long the data production would take and how much it would cost prior to doing the work.  Afremov's attempt to shift the responsibility of inaction on to Lanterman is unavailing.  It was Afremov's counsel who wrote to Lanterman and requested CFS to perform computer forensic services.  Afremov's counsel promised to pay any costs incurred in connection with responding to his letter and the subpoenas.  And, Afremov's counsel failed to ask, at any time, how much the work would cost, how long it would take, and what it would entail.  Granted, the preferable practice would have been to have a written agreement for defined services with precise payment terms, but as Lanterman testified, CFS did not always require a written contract or retainer agreement before providing expert forensic services.  A prime example of this, according to Lanterman, was the work CFS did for the AGA civil case.  Moreover, nothing prevented Afremov's counsel, who initiated the work, from drafting a more formal agreement.  The consequences for any lack of communication or misunderstandings about the work to be done and the cost of the work must be borne by

Afremov.

Afremov similarly faults CFS for not providing an invoice sooner than it did, but the Court finds that CFS was not dilatory in this respect. Petrosinelli first wrote to Lanterman on April 18, 2007. Approximately two weeks later, CFS delivered its first batch of materials to Harris for his review. Subsequent deliveries were made to Harris on May 18th and June 5th. The first invoice was generated on June 15th, after Harris forwarded the first batch of documents to Afremov's counsel. It was reasonable to wait until the first batch of documents was received by Afremov's counsel before charging for the work. The invoice was sent to Afremov's counsel at the end of the month, which is a standard billing practice.

Afremov also faults Lanterman for not immediately moving to quash the subpoena as unreasonable or oppressive, relying on Angell v. Shawmut Bank Connecticut National Ass'n, 153 F.R.D. 585 (M.D.N.C. 1994). In that case, nonparty witnesses sought to recover costs and expenses for complying with a burdensome subpoena even though they had never moved to quash it. Id. at 588, 590. The court noted that if a nonparty complies with a subpoena without objecting to it, and then seeks to recover costs, the court ordinarily would find that the nonparty waived its right to complain and deny the request. Id. at 590. Here, unlike the nonparty witnesses in Angell, CFS and Lanterman did move to quash the subpoenas as unreasonable and oppressive. In addition, contrary to Afremov's position, the Court does not find that the motion was untimely. Lanterman did not find the subpoenas unreasonable or oppressive when he first received them because Afremov's counsel had already agreed to pay for the compilation, review, searches, and production of the documents. The subpoenas did not become unreasonable and oppressive until Petrosinelli refused to pay for the work. Lanterman attempted to resolve the

dispute informally at first, which is always the preferred method of dispute resolution, and when that failed, brought the motion to quash. Thus, Angell is distinguishable because Lanterman properly and timely challenged the subpoena.

Although the Court rejects Afremov's argument that Lanterman failed to proceed properly in opposing the subpoena, the Court finds Afremov's authority instructive for a different reason. The Angell court also discussed the existence of an agreement between the parties concerning the reimbursement of "the reasonable costs of copying documents." Id. "Private agreements save time and expense for the parties and valuable court time as well. Therefore, it is in the interest of justice for this Court to enforce such agreements, under its inherent authority." Id. In the present case, the parties had a private agreement concerning the payment for responding to the subpoenas and Afremov's counsel's requests. It is in the interest of justice to enforce the agreement to pay the costs incurred by CFS and Lanterman in connection with responding to the requests and the subpoenas, as long as the amount is reasonable.

The Court acknowledges that the amount charged for the first production of documents, $674,861.08, is, at first glance, significant. Yet, after having considered the entire record, the Court concludes that the sum is reasonable. Afremov's counsel asked CFS and Lanterman to perform expert forensic services. CFS charged its usual and customary rates for work it actually performed; there is no suggestion otherwise. Afremov asked CFS to produce the documents as fast as possible, and CFS complied, even turning away other work to do so. The cost for similar work in the AGA civil case had exceeded $1,200,000, and another of Petrosinelli's firm's clients had recently incurred $830,000 in fees for similar services by CFS. Those amounts were paid,

and the Court presumes they were reasonable. Other courts have approved extraordinary fees as reasonable when a nonparty witness must respond to a broad subpoena. See, e.g., United States v. CBS, Inc., 103 F.R.D. 365, 369 (C.D. Cal. 1984) (where nonparty witnesses requested more than $2,000,000 in reimbursement, finding that the costs incurred were reasonable, although not awarding the entire amount). Afremov should be ordered to pay CFS $628,737.33 for its invoice dated June 15, 2007.[5]

### C. Lanterman Had No Duty to Retain Work Performed in the AGA Civil Case or to Advise Afremov's Counsel that the Final Product Had Been Deleted

Afremov's counsel suggested for the first time at the May 5, 2008 hearing that Lanterman should have retained and produced to Afremov the final data product produced to the receiver in the AGA civil case. However, there is no evidence that Afremov's counsel requested or expected access to this material. Petrosinelli did not mention it in his letter, nor did Berman at the meeting. If they had mentioned it, Lanterman would have told them that CFS had not kept the final data product.

The final product was deleted according to CFS's retention policy, not by Lanterman's directive. Such routine deletion is necessary to free storage space on CFS's servers.[6] If a client wants to retain a final product, it may either store the data itself or pay CFS to store it, but this had not been arranged in the AGA civil case. Finally, even if CFS had retained the final data product, it would not have satisfied all of the parameters specified in this case and would

---

[5] Afremov has already paid Harris's fee of $46,123.75.

[6] Perhaps a more prudent course in the future would be to give notice to a client before deleting its final data product.

therefore have been of limited use.

### D.  Afremov Should Not Be Required to Pay the Second Invoice

On May 7, 2008, CFS issued a second invoice for some work completed before June 15, 2007, the date of the first invoice, and additional work completed after that date but pursuant to the subpoenas and requests.  The second invoice is dated nearly a year after CFS performed the work, after the motion to quash was filed, and indeed, even after the first hearing on this matter.

The Court concludes that CFS is not entitled to recover the fees charged in the second invoice because they are not reasonable.  In determining the reasonableness of the second invoice, the Court has focused on CFS and Lanterman's conduct.  Of principal importance, the invoice was not issued until a year after the work was performed.  During that year, neither Lanterman nor his counsel told Afremov that CFS had done additional work and intended to bill for it.  The timing of the invoice suggests that Lanterman had decided not to charge for the work but changed his mind for some reason after the first hearing.  Secondarily, CFS never gave Afremov any of the data for which it billed in the second invoice, and it is of no use to him now.

### E.  Afremov Should Not Be Required to Pay CFS and Lanterman's Attorney's Fees

CFS and Lanterman request payment of their attorney's fees for litigating the motion to quash.  They base their request on Petrosinelli's letter of April 18, 2007, in which he said that Afremov would pay Lanterman's attorney's fees incurred in responding to the letter and the subpoenas.

The request for attorney's fees should be denied.  The basis for Petrosinelli's statement was the mutual understanding that Lanterman would need to retain counsel to examine the data

subject to production for work product and attorney-client privileges.  Lanterman then retained Harris to conduct the privilege review, and as agreed, Afremov paid all of Harris's legal fees.  Extending Petrosinelli's promise to the motion to quash, however, goes too far.  Petrosinelli did not offer or agree to pay for attorney's fees incurred in resisting the subpoena.  Accordingly, the present dispute is governed by the general rule that each party must pay for its own legal fees, absent authority or an agreement otherwise.  See Buckhannon Bd. & Care Home v. W. Va. Dep't of Health & Human Resources, 532 U.S. 598, 602 (2001).  The parties should bear their own costs in litigating this dispute.[7]

Accordingly, **IT IS HEREBY RECOMMENDED** that the Motion to Quash Subpoenas by Computer Forensic Services and Mark Lanterman (Doc. No. 277) be **GRANTED** in that Michael Roman Afremov should pay $628,737.33 to CFS for its invoice of June 15, 2007; **DENIED AS MOOT** as to the production of any additional documents; and **DENIED** as to attorney's fees and the invoice dated May 7, 2008.

Dated: August 14, 2008

       s/ Susan Richard Nelson
SUSAN RICHARD NELSON
United States Magistrate Judge

---

[7] CFS and Lanterman expressed an intent to move for attorney's fees pursuant to D. Minn. LR 54.3 upon judgment in this case.  The Court takes no position on this prospective application.

Pursuant to D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 29, 2008**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.