# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL ROMAN AFREMOV,<br><br>Defendant,<br><br>and<br><br>COMPUTER FORENSIC SERVICES<br>and MARK LANTERMAN,<br><br>Movants. | Criminal No. 06-196 (JRT/JSM)<br><br><br><br>**ORDER ADOPTING REPORT AND<br>RECOMMENDATION** |

> William P. Ashworth, Craig D. Singer, and Joseph G. Petrosinelli, **WILLIAMS & CONNOLLY LLP**, 725 Twelfth Street Northwest, Washington, D.C. 20005, for defendant.
>
> Robert J. Borhart and John F. Bonner, III, **BONNER & BORHART LLP**, 220 South Sixth Street, Suite 1950, Minneapolis, MN 55402-4521, for movants Computer Forensic Services and Lanterman.

This case is before the Court on defendant Michael Afremov and movants Computer Forensic Services ("CFS") and Mark Lanterman's objections to an Amended Report and Recommendation issued by United States Magistrate Judge Susan R. Nelson.[1]

---

[1] This case has subsequently been reassigned from United States Magistrate Judge Nelson to United States Magistrate Judge Janie S. Mayeron.

For the reasons given below, after a *de novo* review[2] of the parties' objections to the Magistrate Judge's dispositive rulings, the parties' objections are overruled and the Court adopts the Report and Recommendation in full.

## BACKGROUND

CFS is a company headquartered in Minnesota that provides electronic discovery, forensic analysis, and litigation support services. Lanterman is the Chief Technical Officer of CFS.

In 2005, CFS served as an expert consultant to a court-appointed receiver for AGA Medical Corporation ("AGA") in a civil case involving defendant Michael Afremov. (*See* Lanterman Aff., Docket No. 280, ¶ 2.) As part of its work in that case, CFS reconstructed, searched, and produced electronic data from hard drives and other electronic storage devices obtained from AGA. (*Id*.) The AGA civil case concluded on or about December 2005. (Hearing Tr., Docket No. 359, at 18.) An individual who had previously served as AGA's receiver later informally advised Lanterman to retain the raw AGA materials that CFS was originally provided with. (*Id*., at 31.) However, Lanterman was not instructed to retain CFS's final work product. CFS deleted that final work

---

[2] The Court notes that it is not entirely clear that the Magistrate Judge's rulings should be reviewed *de novo*. Ordinarily, a Magistrate Judge's handling of a motion to quash a subpoena would clearly fall within the category of non-dispositive rulings that are merely reviewed for clear error. *See* 28 U.S.C. § 636(b)(1)(A); Local Rule 72.2(a); *Etten v. U.S. Food Serv., Inc.*, No. 05-833, 2006 WL 1390395, at *4 (N.D. Iowa May 19, 2006). On the other hand, this motion is an atypical motion to quash, in that it requires a dispositive ruling on whether Afremov agreed to pay several hundred thousand dollars in expenses. In any event, the Court need not conclusively resolve this question, because regardless of which standard is used the Court agrees with the conclusions of the Magistrate Judge.

product in December 2006, in accordance with its typical data retention practices. (*Id.*, at 34-35.)

On June 27, 2006, Afremov and two co-defendants were charged in a fifteen-count indictment with various wire fraud and money laundering offenses. On April 17, 2007, Afremov served subpoenas on CFS and Lanterman, requesting (1) "[a]ll documents, including all electronic files or data, obtained from AGA Medical Corporation or any of AGA's officers, directors, owners, employees, attorneys or receivers"; (2) "[a]ll documents including all electronic files or data, that refer, relate, or pertain to Franck Gougeon, Kurt Amplatz, Michael Afremov, AGA Medical Corporation[,] Frederick Fischer, or Foremost Machining Company"; and (3) "[a]ll electronic mail created or received by Franck Gougeon, Kurt Amplatz, Michael Afremov, or any officer, director, or employee of the AGA Medical Corporation." (Docket No. 277, Ex. A.) The return date on the subpoenas was September 10, 2007, the original scheduled start date for Afremov's criminal trial. (*Id.*)

Lanterman indicates that if he had merely received a subpoena in this matter, he would have simply allowed Afremov to access the original, raw AGA data on his own. (Lanterman Aff., Docket No. 280, ¶ 9.) However, additional communications from Afremov's legal team soon followed.

On April 18, 2007, Afremov's counsel Joseph Petrosinelli wrote Lanterman a letter addressing the AGA materials. Petrosinelli stated

> We understand that some time ago, in your capacity as an expert consultant to the Receiver of AGA Medical Corporation, you and/or your company took custody of certain AGA documents, including electronic files. We

> believe those documents contain information that is relevant to our defense of Mr. Afremov in the criminal case, and at the appropriate time we intend to serve subpoenas on you and your company calling for production of the documents to us. Thus, we request that you preserve such documents in your possession, and that you conduct whatever compilation and review of the documents you believe is necessary in advance of production to us.

(Lanterman Aff., Docket No. 280, Ex. A.) The letter added that Afremov believed he was entitled to access the AGA materials pursuant to a discharge order entered in the AGA civil case, and promised to "pay any costs, including reasonable attorney's fees, that you incur in connection with responding to this request and the forthcoming subpoenas." (*Id.*)

A short time letter, Lanterman met with Afremov's local counsel, Frank Berman, and discussed a plan for Lanterman to conduct searches of the AGA data. These meetings were held at the offices of Scott Harris, an attorney Lanterman had retained on Berman's recommendation to review the eventual document production for any privilege issues. Lanterman explained to Berman that the AGA data involved up to one million emails and documents, and Berman understood that at some point someone was going to have to "get the emails that we needed from this mass of data." (Hearing Tr., Docket No. 359, at 105-106.) Berman had some understanding of the nature of CFS's work in these contexts, as he testified that he and Petrosinelli "were very well aware of the extensive work that Mr. Lanterman had done and billed for on the AGA matter."[3] (*Id.*, at 137.)

---

[3] Afremov contends that Lanterman "hid" the fact that he had deleted the AGA work product (and would therefore have to repeat some of the work that had been done in connection

(Footnote continued on next page.)

Lanterman and Berman worked together to determine appropriate search terms for Lanterman to use in sorting through the AGA materials and compiling what Afremov needed. (*Id.*, at 106.) Lanterman recalls Berman telling him "to search everything and leave no stone unturned." (*Id.*, at. 38). In addition, Berman asked Lanterman to produce the responsive documents as soon as practicable, despite the fact that the return date on the subpoenas was several months away. (*Id.*, at 135.) Despite this call for Lanterman to search widely and quickly in an enormous universe of data – and despite Berman's knowledge that CFS had performed very expensive, time-consuming services in a prior case – Berman admits that he never inquired about the specific costs Lanterman expected to incur. (*Id.*, at 125, 127.)

CFS employees subsequently worked 1500 hours over the course of three weeks to produce four million pages of data for Afremov. (Lanterman Aff., Docket No. 280, ¶ 9.) Lanterman indicates that to produce this data, CFS "had to load, decrypt, and verify 84 hard drives, 13 data DVDs, and 21 data CDs," and "extract emails from exchange servers." (*Id.*, ¶ 7.) Lanterman indicates that the email extraction alone required approximately 400 hours, and that analysis and processing of the email compilation took another 300 hours. (*Id.*) The first set of responsive documents was delivered to Harris,

_____

(Footnote continued.)

with the AGA civil case). As set forth below, however, there are no indications in the record that Berman or Petrosinelli ever asked about whether that prior work product had been preserved or whether it might adequately serve their purposes in Afremov's criminal case, and no meaningful indications that they (silently) relied on that possibility.

who reviewed them for attorney-client and work-product privileges. The non-privileged documents were then produced to Afremov's counsel.

CFS issued an invoice for this first production of documents on June 15, 2007, for $674,861.08. Petrosinelli refused to pay the invoice, other than Harris's related attorney's fees of $46,123.75. Lanterman alleges that Petrosinelli's initial reason for this refusal was that he did not want to appear to have bought a witness. (Hearing Tr., Docket No. 359, at 38.) Berman testified that he was surprised when he learned the size of the invoice, and that he subsequently told Harris to instruct Lanterman to stop working on the project immediately. (*Id*., at 116.)

Informal attempts to resolve the dispute over the invoice failed. On July 11, 2007, Harris sent a letter to Petrosinelli and Berman explaining his understanding that under the discharge order entered in the AGA civil case, Afremov had a right to access the disputed materials only "so long as he pays any costs, including reasonable attorney's fees, incurred by Mr. Lanterman and [CFS]." (Lanterman Aff., Docket No. 280, Ex. B.) On October 1, 2007, Petrosinelli responded that Lanterman was a mere fact witness, entitled to mere incidental costs and statutory witness fees. (Bonner Aff., Docket No. 279, Ex. C.) Harris disagreed with this characterization, countering that the entire premise of the parties' agreement – which called for CFS's early production of the disputed documents, and for Lanterman to search and organize the data – implied that CFS and Lanterman were more than mere fact witnesses, and were entitled to be paid their standard billing rates. (*Id*., Ex. D.)

On March 3, 2008, CFS and Lanterman moved to quash the subpoenas, arguing that they were overbroad, oppressive, and unreasonable, largely because they had not yet been paid. In addition to requesting that the subpoena be quashed, CFS and Lanterman also asked that Afremov be required to pay its first invoice. In short, CFS and Lanterman contended that Afremov and his counsel had effectively contracted with Lanterman and CFS to provide expert forensic services, and had subsequently refused to pay for those services.

On March 19, 2008, Afremov pled guilty, eliminating Afremov's need for CFS's services and work product in his criminal case. After a letter request from CFS and Lanterman advising that there was still a live dispute over CFS's invoice, the Court referred the motion to quash to the Magistrate Judge.

On May 5, 2008, the Magistrate Judge held a hearing on the motion, but determined that additional information from Lanterman was needed before a ruling could be issued. On May 7, 2008, CFS issued a second invoice to Afremov for $178,850, for work allegedly performed before June 15, 2007, the date of the first invoice, and for other work completed before CFS was instructed to stop working. After both parties subsequently filed additional materials with the Court, the Magistrate Judge determined that an evidentiary hearing was necessary in order to resolve material inconsistencies in the record. Lanterman and Berman both testified at a hearing held on June 9, 2008, and the parties subsequently filed additional post-hearing memoranda.

The Magistrate Judge issued a Report and Recommendation recommending that Afremov be required to pay $628,737.33 to satisfy the first invoice issued by CFS, but

that CFS's request that Afremov be required to pay the second invoice be denied. The first of these recommendations was based on the Magistrate Judge's conclusion that Afremov, through the communications of Petrosinelli and Berman, had effectively hired Lanterman and CFS to perform expert forensic services. After receiving correspondence from AGA concerning a peripheral factual issue about access to the original AGA data, the Magistrate Judge issued an Amended Report and Recommendation. Both parties have now filed objections, and Afremov has twice filed additional briefing seeking to raise new issues.

## ANALYSIS

### I. BURDEN OF PROOF

Afremov first argues that the Magistrate Judge improperly assigned him the burden of proof, when this burden should have rested on the plaintiff, as in any other contract dispute. *See Porous Media Corp. v. Midland Brake, Inc.*, 220 F.3d 954, 960-61 (8th Cir. 2000). However, the passages that Afremov relies on to demonstrate this supposed error merely reveal the Magistrate Judge's unremarkable recitation of a fundamental principle of contract interpretation: "Where there are ambiguous terms or the intent is doubtful, it is axiomatic that the contract will be construed against the drafter." *Turner v. Alpha Phi Sorority House*, 276 N.W.2d 63, 66 (Minn. 1979). In a case in which the critical agreement arose from a letter drafted by Afremov's attorney, that principle was highly relevant, and it is unsurprising that the Magistrate Judge referenced it. The Court finds nothing in those references, or in anything else in the

Report and Recommendation, that explicitly or implicitly expands on that principle in a manner that inappropriately shifted the burden of proof.

## II. LANTERMAN AS A FACT WITNESS

Next, Afremov argues that he should not be required to pay CFS and Lanterman's first invoice, because Lanterman was merely subpoenaed as a fact witness, and was therefore not entitled to the type of compensation ordinarily paid for expert services. Afremov argues that this is apparent from the fact that Petrosinelli's letter fails to expressly identify Lanterman as an expert; fails to specifically discuss billing rates; and contemplates paying Lanterman's "costs," as opposed to his "fees" or "rates." The Magistrate Judge disagreed, concluding that it did not fully account for other aspects of Petrosinelli's letter, or the discussions between Berman and Lanterman.

As an initial matter, the Court agrees with the Magistrate Judge's conclusion that the terms of Petrosinelli's April 18, 2007, letter contemplate something broader than a relationship between a litigant and a subpoenaed fact witness. Petrosinelli's letter first notes that he was aware that CFS had originally taken custody of the AGA documents in its "capacity as an expert consultant." (Lanterman Aff., Docket No. 280, Ex. A.) In addition, as noted above, Berman testified that he and Petrosinelli "were very well aware of the extensive work that Mr. Lanterman had done and billed for on the AGA matter." (Hearing Tr., Docket No. 359, at 137.) In other words, Petrosinelli was familiar with the nature of CFS's business, as well as with its expense. Equipped with that knowledge, Petrosinelli nonetheless instructed CFS to conduct "whatever compilation and review of

the documents that you believe is necessary." (Lanterman Aff., Docket No. 280, Ex. A.) He also indicated that Afremov would pay "any costs, including reasonable attorney's fees, that you incur in connection with responding to this request **and** the forthcoming subpoenas." (*Id*. (emphasis added).) In those circumstances, it is unsurprising that Lanterman would have considered this a request for CFS's expert services.

Any doubts about whether this is what Afremov was requesting would almost certainly have been eliminated after Lanterman's meetings with Berman. As explained above, Berman testified (1) that Lanterman informed him that the AGA data "was a massive amount of information"; (2) that he was familiar with the services CFS had provided in the AGA civil case; and (3) that the pair discussed the appropriate search parameters for Lanterman to use before he began his work. In other words, Berman knew, at a minimum, that Lanterman would be doing something more than merely handing over what he had – or merely permitting access to the AGA data – and clearly conveyed this understanding to Lanterman by discussing specific search terms. In addition, Berman indicated that Afremov wanted the work done "as soon as is practicable." (Hearing Tr., Docket No. 359, at 135). This instruction would likely have suggested there was a timeline in place for providing services to Afremov, apart from the subpoena's September 10, 2007, return date. In short, while Afremov may well be correct that Berman's subjective intent was not to arrange for CFS to provide its typical services, his actions and words, at a very minimum, did not make that clear. Instead, he requested that a company that specializes in forensic data analysis begin a data search, with full knowledge that CFS had provided extensive (and expensive) forensic search

services in the related civil case. Without some explicit limits on what Berman was asking for, it is plain that anyone in Lanterman's position would have understood Berman to be requesting CFS's typical services.

In light of the combination of Petrosinelli's letter and the Berman meeting, the Court agrees with the Magistrate Judge that, as a matter of law, Afremov's relationship with CFS rose above a relationship with a subpoenaed witness, and constituted an agreement for Afremov to compensate CFS for its forensic services. Accordingly, the Court adopts the Magistrate Judge's recommendation that Afremov be required to pay for those services.

## III. AMOUNT OF THE FIRST INVOICE

Afremov also argues that even if he is required to pay the first invoice, he should not be required to pay the full amount. First, he argues that he should have been permitted to take additional discovery, and should have been allowed access to an *ex parte* affidavit filed by CFS detailing CFS's profit margins on the disputed work. Second, Afremov argues that most of the charges detailed on the June 15 invoice are not reasonable.

As to Afremov's first argument, this Court will only reverse a Magistrate Judge's handling of a non-dispositive issue – such as a dispute over whether additional discovery should take place, or whether a party should have had access to sealed evidence – if it is clearly erroneous or contrary to law. *See* 28 U.S.C. § 636(b)(1)(A); Local Rule 72.2(a).

That standard of review is "extremely deferential." *Reko v. Creative Promotions, Inc.,* 70 F. Supp. 2d 1005, 1007 (D. Minn. 1999).

Afremov initially raised the subject of additional discovery in a supplemental memorandum submitted to the Magistrate Judge on May 22, 2008. That memo stated that "Lanterman's statements to the Court must be subjected to cross-examination and exploration before the Court relies on them in any way." (*Id.*, at 7.) The Magistrate Judge later held a hearing that afforded Afremov an opportunity to challenge Lanterman in cross-examination. In his memo filed after that hearing, Afremov did not argue that he still had not had a sufficient opportunity to challenge Lanterman's contentions, or that the Magistrate Judge should delay her decision until he had an opportunity to conduct additional discovery. In those circumstances, the Magistrate Judge may have reasonably concluded that Afremov had abandoned his request for additional discovery, perhaps because the opportunity to cross-examine Lanterman at the hearing had been sufficient to satisfy his concerns. In those circumstances, the Court finds no clear error in the Magistrate Judge's decision to rule on the merits of this dispute without providing Afremov an opportunity to seek additional evidence.

As to the *ex parte* explanation of CFS's profit margins, Afremov notes that he orally requested access to the affidavit at the evidentiary hearing. (Hearing Tr., Docket No. 359, at 74.) Afremov's final arguments submitted to the Magistrate Judge after the hearing, however, does not mention this issue. (*See* Docket No. 362.) As with the question of whether Afremov should have been allowed to conduct additional discovery, the Magistrate Judge did not clearly err by failing to consider this issue *sua sponte* in her

Report and Recommendation. In any event, the Court notes that a company's profit margin would likely be a sensitive trade secret, and finds no clear error in the merits of the Magistrate Judge's decision to keep it under seal.

As to the amount of the charges, which this Court reviews *de novo*, Afremov makes three additional objections. Afremov first argues that Lanterman did not warn him that his work would require decryption and extraction of the data from hard drives, which led to the majority of the charges. Afremov appears to contend that this work should have been unnecessary in light of the previous work that CFS performed in connection with the AGA case. Petrosinelli's letter, however, did not ask for CFS's earlier work product; rather, it asked for materials that CFS had "t[aken] custody of." Nor are there indications that Berman inquired about CFS's earlier work product in his meetings with Lanterman. In short, there is no basis in the record for concluding that CFS had an obligation to retain its prior work product, and no basis for concluding that Afremov's attorneys were entitled to rely on their supposed assumption that he had done so.

Afremov next argues that the "sheer total" of the invoice – along with the large number of hours billed by CFS – demonstrates that the charges were not contemplated by the parties' agreement. As noted above, however, Berman testified that he and Petrosinelli were aware of the significant expense that CFS had incurred in the AGA civil case. Berman indicated that he simply did not inquire about how much CFS's work would cost in this case, and Afremov offers no passable explanation for why CFS should be required to absorb losses in this matter merely because Afremov did not pursue more details.

Finally, Afremov argues that CFS's bill should be vacated or reduced because CFS should have sent its bills on a monthly basis, rather than after the majority of the work was completed. Afremov contends that this would have given him an opportunity to recognize how expensive this work was, and bring it to a halt. As the Magistrate Judge explained, however, CFS sent an invoice soon after it was prepared to deliver the first batch of documents. Afremov points to no agreement that required CFS to handle billing differently. The Court agrees with the Magistrate Judge that CFS's approach was not unreasonable, and that it does not justify a reduction in the amount charged in the invoice.

In sum, the Court finds no basis for disturbing the Magistrate Judge's well-reasoned conclusion that Afremov should be required to pay CFS the amount charged in the first invoice.

## IV. THE SECOND INVOICE AND ATTORNEY'S FEES

CFS and Lanterman object to the Magistrate Judge's conclusion that Afremov should not be required to pay the second invoice, which was sent approximately a year after the work that it covered, and after the Magistrate Judge had held a hearing on the first invoice. The Magistrate Judge noted, and CFS and Lanterman do not dispute, that in the year between when the work was allegedly performed and when Lanterman issues the invoice, neither Lanterman nor his counsel informed Afremov of the additional work, or indicated that another bill was forthcoming. Moreover, as the Magistrate Judge noted, the data covered by the second invoice was never provided to Afremov, and now is of no

use to him, as his criminal case has concluded. In those circumstances, the Court finds no fault in the Magistrate Judge's conclusion that CFS has not credibly demonstrated that these expenses were contemplated by the parties' agreement.

As to attorney fees, the letter that formalized the parties' arrangement stated that Afremov would pay any attorney's fees that Lanterman and CFS incurred "in connection with responding to this request and the forthcoming subpoenas." (Lanterman Aff., Docket No. 280, Ex. A.) The Court agrees with the Magistrate Judge that the clear import of this provision was that Lanterman and CFS would be reimbursed for any legal expenses necessary in the course of determining what was privileged. Lanterman and CFS's attorney was paid for that work. The Court agrees with the Magistrate Judge that the litigation over CFS's motion to quash is beyond the scope of what was promised in the disputed letter, and that an award of attorney's fees would be inappropriate.

## V. JURISDICTION

Twice in the months following the Magistrate Judge's Amended Report and Recommendation in this case, Afremov has requested to file additional memoranda challenging this Court's jurisdiction to decide this matter. As an initial matter, these issues were not raised before the Magistrate Judge, who conducted a motion hearing, reviewed several rounds of briefing, conducted an additional evidentiary hearing, issued a Report and Recommendation, and issued an Amended Report and Recommendation after a challenge to her recitation of the facts. In short, significant judicial resources have been

expended on this matter, and this Court looks very dimly on Afremov's raising of a jurisdictional issue so late in the litigation.

In any event, the Court is authorized to exercise ancillary jurisdiction "(1) to permit disposition by a single court of claims that are, in varying respects and degrees, factually interdependent; and (2) to enable a court to function successfully, that is, to manage its proceedings, vindicate its authority, and effectuate its decrees." *Peacock v. Thomas*, 516 U.S. 349, 354 (1996) (internal quotation marks omitted). The Court is satisfied that its resolution of a matter that has consumed extensive judicial resources – without objection from parties who stood to benefit a good deal from avoiding the expense of an entirely new lawsuit – falls well within the bounds of that standard. In short, the evidentiary materials in dispute were closely tied to Afremov's defense against a significant criminal case in this Court; this motion arose out of an invocation of this Court's subpoena power, *see* Fed. R. Crim. P. 17 (contemplating federal courts handling a wide array of subpoena-related issues in the context of criminal cases); and the federal court system's interest in managing its resources is plainly implicated by a party seeking to shift venues only after having discovered the outcome. Accordingly, Afremov's challenge to this Court's jurisdiction is rejected.[4]

In sum, the Amended Report and Recommendation of the Magistrate Judge is adopted in full.

---

[4] As a technical matter, the parties' requests to file additional briefing on these issues are granted. [*See* Docket Nos. 383, 385, 386.] The Court has considered those briefs in addressing this issue.

# ORDER

Based on the foregoing records, files, and proceedings herein, the Court **OVERRULES** the objections of Michael Roman Afremov [Docket No. 372] and Movants [Docket No. 371] and **ADOPTS** the Magistrate Judge's Report and Recommendation dated August 12, 2008 [Docket No. 369]. Accordingly, **IT IS HEREBY ORDERED** that Movants' motion to quash subpoenas [Docket No. 277] is **GRANTED in part** and **DENIED in part** as follows:

1. The motion is **GRANTED** as to Computer Forensic Services' request for payments on its invoice of June 15, 2007. Afremov is ordered to pay Computer Forensic Services $628,737.33.

2. The motion is **DENIED** as to attorney's fees and the second invoice dated May 7, 2008.

3. The parties various motions to file supplemental briefing on the question of this Court's jurisdiction [Docket Nos. 383, 385, and 386] are **GRANTED**.

DATED: September 28, 2009  
at Minneapolis, Minnesota.

                                           ____s/ John R. Tunheim____  
                                           JOHN R. TUNHEIM  
                                           United States District Judge